JODI LINKER
Federal Public Defender
Northern District of California
SOPHIA WHITING
Assistant Federal Public Defender
8th Floor - Suite 820
55 South Market Street
San Jose, CA 95113
Telephone: (408) 291-7753
Facsimile: (408) 291-7399
Email: Sophia_Whiting@fd.org

Counsel for Defendant ALNAS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–00244 EJD |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| WILLIAM HERNANDEZ ALNAS, | |
| Defendant. | |

William Alnas is scheduled for sentencing on May 12, 2025. Mr. Alnas was considered for admission to the Convictions Alternative Program (CAP). However, the CAP Assessment noted "because of his significant progress to date, [Mr. Alnas] may not need the structure and support of CAP in order to remain on the right track." Exhibit N (CAP Assessment) at 4. The CAP team ultimately agreed with this assessment and did not find Mr. Alnas to be the right fit for the CAP program. Based on feedback from the CAP team, Mr. Alnas and his counsel have completed an Individualized Success Plan (ISP) with the assistance of Pretrial Services as part of his sentencing recommendation. *See* Ex. A (LS/CMI Screening and ISP).

Consistent with this ISP, Mr. Alnas' request is to defer sentencing for six months while he is required to complete the goals identified in the ISP and approved by Pretrial Services. If Mr. Alnas successfully completes his ISP, Mr. Alnas expects to request a sentence of time served.

In the alternative, if the Court decides to sentence Mr. Alnas at this time, the defense respectfully requests the Court consider the "significant progress" Mr. Alnas has made on Pretrial release, his detailed plan for continued success on supervised release, and his health circumstances, to sentence Mr. Alnas to time served and three years of supervised release.

## BACKGROUND

Mr. Alnas was born in Watsonville, California. Presentence Investigation Report (PSR) ¶ 46. He grew up in a working-class family and had all of his basic material needs met. PSR ¶ 47. He was born with a congenital heart defect, though, and this health challenges were a constant presence in his childhood. PSR ¶ 47. While his mother was understandably protective, her concerns for his health felt stiflingly overbearing for a young boy who wanted to have fun with his friends. *See id*. While he participated in some activities, he could not run along with the other kids and his movements were constantly supervised. *See id*. He learned to mask how he was feeling physically and emotionally, to not draw more attention, concern, and restrictions from his mother and others. At the same time, he personally struggled with facing the possibility of death at a young age, and experiencing his first open heart surgery as a teenager left him particularly aware of his own mortality. *See* PSR ¶ 56.

This protective childhood caused Mr. Alnas to develop a desire to rebel with peers and try to suppress his fears about his health. He left high school early after learning he was expecting a child with his girlfriend. PSR ¶ 49. Still teenagers, the couple left home, got married, and settled down with their baby girl in Hollister, California. *See id*. Despite the uncertain circumstances, Mr. Alnas was committed to supporting his family. He worked his way to becoming a service technician for windows and doors. After he was laid off in 2008, Mr. Alnas had his first arrest, for personal possession of cocaine found in his pants pocket during a traffic stop. PSR ¶ 42. He completed drug court successfully. *Id*. He thereafter enrolled in a medical billing and coding vocational program through the Institute for Business and Technology in Santa Clara. PSR ¶ 64. He was employed in this field until 2015, when he briefly working in retail before he ultimately had to stop working altogether in 2016 due to his worsening health. PSR ¶ 65-66. Mr. Alnas has received disability benefits due to his heart condition since 2017. *See id*.

Again finding himself unemployed and struggling with his health, Mr. Alnas went on a

1  downward spiral, making terrible decisions that only worsened his health condition. *See* Ex. M
2  (Hazel Hopkins Hospital Records). He was repeatedly admitted to the hospital for heart
3  complications. *See* Ex. M; Ex. L (Letter from Cardiologist). On at least two occasions—in 2016 and
4  2017—the hospital administered toxicology reports that came back positive for methamphetamine,
5  cocaine, and marijuana. Ex. M. Yet Mr. Alnas placed the blame for his health circumstances squarely
6  on his heart defects rather than acknowledge that the cardiac events were related to abuse of drugs.
7  He distanced himself from his family and spent more time away from the house. *See* Ex. D (Wife
8  Linda's Letter). These decisions led to his deeper involvement in drug use, poor social associations,
9  and ultimately drug sales, resulting in his arrest in this case.

10  The instant case arose when, in April 2021, a confidential source (CS) told the FBI about Mr.
11  Alnas' co-defendant Richard Guttirez, who the CS knew to be regularly selling half-pound quantities
12  of methamphetamine and cocaine. Dkt. 65 at 3. The CS arranged a sale between Mr. Guttirez and the
13  FBI undercover agent (UC). *Id*. Starting in June 2021, Mr. Guttirez sold a half-pound followed by
14  pound-quantities of methamphetamine to the undercover agent on multiple occasions in the summer
15  of 2021. *Id*. Mr. Guttirez also told the UC he could supply the UC with firearms. *Id*. On one occasion,
16  Mr. Guttirez explained to the UC that he did not have firearms available at the moment because he
17  had recently supplied firearms to Mr. Alnas and other members of the motorcycle club. *Id*.; PSR ¶ 8-
18  9. In September 2021, the CS-1 then approached Mr. Alnas at a bar to ask about purchasing drugs
19  from him. PSR ¶ 10. Mr. Alnas agreed and thereafter supplied drugs on multiple occasions to the CS-
20  1 then UC. PSR ¶ 13-20. All of Mr. Alnas' charged sales were to the CS-1 or the UC. After seven
21  months of discussing the potential of firearms sales, firearms which Mr. Alnas did not immediately
22  have access to, Mr. Alnas was able to acquire and sell firearms to the UC as requested. Mr. Guttirez
23  and Mr. Alnas were each charged with one count of distribution of 50 grams and more of
24  methamphetamine. There were no charges of a conspiracy between the co-defendants. There are no
25  allegations that Mr. Alnas supplied any drugs or guns to Mr. Guttirez, nor does the evidence support
26  a conclusion that Mr. Alnas was involved in more serious criminal activity than Mr. Guttirez. To the
27  contrary, the evidence indicates that Mr. Guttirez had supplied guns to Mr. Alnas, not the other way
28  around. Mr. Guttirez and Mr. Alnas are not charged jointly in any count.

On June 30, 2022, Mr. Alnas was arrested. PSR at 1. During his prebail interview, he admitted to pretrial services that he had been struggling with substance abuse, which is corroborated by his medical records and criminal record. *See* Ex. N (CAP Assessmet); Ex. M (Hospital Records); PSR ¶ 39-44. Substance abuse treatment was imposed as a condition of his release. In addition to drug treatment, Mr. Alnas also began programming heavily with NA to maintain his sobriety. Ex. C (NA Attendance Slips). He has been following an NA Program since his arrest, attending on average two to four meetings in person per week. *Id*. He has become the Monday-night secretary for his home group in Hollister. *Id*. While he has been able to remain sober, he is still finding his footing in other areas of his life. He recently enrolled in a high school diploma program at Morgan Hill Community Adult School. Ex. K. He would like to work, but his health circumstances has made that tenuous as he has had recent episodes of abnormal heart rhythms that have not yet been managed through medication or outpatient procedures. His goal is to find employment that does not require physical activity that he can perform safely with the approval of his doctor. He would also like to work on his mental and emotional health and, in particular, continue strengthening his relationship with his family.

## DISCUSSION

### I. Sentencing Guidelines

Per the parties' guidelines calculations, Mr. Alnas' adjusted offense level is 25. Dkt. 65 at 2. Probation's calculation in the PSR varies for two reasons: (1) Probation does not agree with the parties' decision to apply the zero-point offender reduction pursuant to USSG 4C1.1 due to Mr. Alnas' prior DUI offense; and (2) at the time the PSR was submitted, Probation did not yet apply the safety-valve reduction in the PSR, but the government has confirmed that the safety-valve reduction does apply to Mr. Alnas at this time. *See* PSR ¶ 36; Dkt. 65 at 2. Mr. Alnas' criminal history category (CHC) is I. PSR ¶ 41. The advisory guideline range as set forth in the plea agreement is therefore 57 to 71 months.

Although the Court must remain mindful of the Guideline recommendation, the range established by the Sentencing Guidelines is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d

864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court's paramount concern is to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991.

Under the applicable 18 U.S.C. § 3553(a) factors, Mr. Alnas respectfully requests that the Court consider a deferred sentencing path with an individualized success plan in lieu of CAP, during which time Mr. Alnas will continue to demonstrate his commitment to rehabilitation.

In the alternative, Mr. Alnas respectfully requests the Court vary downward from the low end of the advisory range to a sentence of time served and three years of supervised release with strict conditions of supervised release at this time, in recognition of the significant progress he has made over the past nearly three years, during which time he has successfully engaged with drug treatment and rehabilitative success under the supervision of Pretrial Services.

## II. Mr. Alnas was struggling with substance abuse predating his arrest, and has made incredible strides in his recovery with the support of Pretrial Services

Mr. Alnas requested admission into CAP to support his continued recovery from substance abuse, specifically abuse of methamphetamine, cocaine, alcohol, and marijuana. Mr. Alnas struggled with substance abuse for many years predating his arrest. Mr. Alnas was a higher-functioning addict, who carefully avoided detection of his deadly substance use disorder by his family. But toxicology screens from 2016 and 2017 provide irrefutable evidence that Mr. Alnas was abusing dangerous drugs, including methamphetamine, cocaine, and cannabinoids. *See* Ex. A at 2 ("Social History Comment: hx of positive meth jan 2016, cocaine 03/2017); Ex. A at 12 (positive cocaine and cannabinoids screen from 03/24/2017); Ex. A at 18 (positive amphetamine screen from 01/23/2016). Doctors appropriately had conversations with him about his positive drug tests for amphetamines (which includes methamphetamine) and cocaine outside of the presence of his family. *See* Ex. A at 14. The doctor explained how his drug abuse likely caused his heart episodes of V. tach (Ventricular Tachycardia) that caused him to be admitted to the hospital. *See* Exhibit A, Hazel Hawkins Medical Records, at 14 ("With the family gone I did tell the patient that I was concerned that he had cocaine

positive urine on this visit and had amphetamine positive urine prior visit for V. tach. I told him that these sympathomimetics could very likely have caused his V. tach and may lead to a heart attack or death in him."). But Mr. Alnas' deep shame and denial about using drugs with his heart condition kept him from being honest even with his doctors in emergency situations. His addiction therefore remained unaddressed and undetected by family members, although his conduct caused distance between himself and his wife for many years. See Ex. C.

He now acknowledges that multiple admissions to the hospital were due to substance abuse, as the doctors had identified. He also has a conviction for driving under the influence and an arrest for possessing a baggie of cocaine in his pocket, for which he was referred to drug court in 2009. *See* Dkt. 63, PSR, at 10. His criminal history and positive toxicology screens corroborate his statements to Pretrial Services and Dolan Mental Health that he was abusing cocaine, methamphetamine, and cannabinoids predating his arrest. He was abusing the same drugs that he is convicted of distributing in this case. He would eventually sell drugs to support his habit, since he was concealing his substance abuse from his family and did not want to use family funds. While Mr. Alnas was involved in a motorcycle club—he was not outwardly perceived by his family or community members as being involved in criminal activity. *See* Ex. D; Ex. J ("When I learned of the charges pending against Mr. Alnas, I immediately felt there must have been some sort of A [sic] mistake, mistaken identity or a misunderstanding, because as long as I've known him, I've never known him to partake in any type of criminal activity.").

In addition to supporting his continued sobriety, Mr. Alnas hopes his ISP can help him repair family relationships, chose better companions, understand personal trauma, secure employment, and better serve his community. An ISP provides this accountability and support, as well as the continued testing and treatment to ensure that Mr. Alnas' substance abuse does not again go undetected.

**III.    Deferred sentencing with an ISP or a sentence of time served is appropriate for Mr. Alnas since he would not benefit from CAP due to his significant progress to date**

Pursuant to section 3553(a)(3), the Court shall consider the kinds of sentences available. In assessing Mr. Alnas for CAP, Pretrial Services found the following:

Although Mr. Alnas meets the prognostic risk and criminogenic need factors to qualify

1  for CAP, the defendant has been able to remain clean and sober for over a year. Given
2  his history, this is a significant accomplishment that should be recognized, and he
3  should be commended for his progress. However, because of his significant progress to
4  date, he may not need the structure and support of CAP in order to remain on the right
5  track.

6 Ex. M at 4. Pretrial Services also raised a question about Mr. Alnas' responses regarding his
7 history of substance abuse, but Mr. Alnas has subsequently provided medical documentation
8 predating his arrests of positive tests for precisely the substances he disclosed—cocaine,
9 methamphetamine, and cannabinoids. His answers to questions about alcohol are not inconsistent
10 whatsoever—as someone engaged in treatment and NA programming he recognizes that he needs to
11 continue receiving treatment for alcohol and drugs regardless of whether he has had specific
12 "problems" with alcohol within the past 30 days (which implies relapse or near-relapse). He knows
13 precisely how quickly he could go off track without proper treatment and NA support, which he sadly
14 witnessed when he recently lost a member of his NA fellowship earlier this year. *See* Ex. H (the
15 author of this letter tragically passed after writing of their shared progress in NA). Mr. Alnas has
16 discussed his history of substance abuse with the CAP team and if there are any ongoing concerns
17 about inconsistencies in his history, the defense would request an opportunity to address those
18 specific concerns.

19 The government opposed Mr. Alnas' referral to CAP and, after he was not admitted to CAP,
20 opposed defense counsel's request for a brief continuance to change course and develop the
21 Individualized Success Plan in coordination with Pretrial Services. The government has previously
22 framed these continuances as delay tactics or a result of Mr. Alnas refusing to plead guilty. Dkt 71.
23 That is not correct. To counsel's knowledge, Mr. Alnas never put the government in a position where
24 they would need to prepare for trial or indicated a desire to proclaim his innocence at trial. The
25 requested continuances were simply standard requests from *counsel* to adequately understand and
26 address the case. Before new counsel was added to Mr. Alnas' case, counsel for both defendants
27 required multiple continuances in order to receive and review discovery. Once new counsel was
28 added just nine months ago, new counsel needed to familiarize herself with the case, discovery, the

1 client; complete the safety valve requirements; complete the PSR interview and drafting process;
2 revisit the CAP process that had been initiated but not further pursued; request and review Mr. Alnas'
3 medical history and records; and generally undertake the mitigation preparation required to proceed
4 to sentencing. Pretrial Services had screened Mr. Alnas as eligible for CAP and defense counsel
5 could not proceed to sentencing before addressing the outstanding CAP process—the requests to
6 address these issues before sentencing were reasonable and appropriate. The time defense counsel
7 requires to effectively prepare should not be held against Mr. Alnas, especially since he has complied
8 perfectly with all of his conditions of pretrial release and shown unwavering dedication to his
9 rehabilitation in the interim.

10 At present, undersigned counsel has been informed that the ongoing barrier to Mr. Alnas' entry
11 to CAP was precisely what Pretrial Services identified—that he has been committed to significant
12 progress over the past 2.5-3 years and may not need the structure and support of CAP at this time. To
13 find that Mr. Alnas should be incarcerated because he has demonstrated too much progress to benefit
14 from CAP would be an affront to fairness and would create unwarranted disparities between
15 defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C.
16 § 3553(a)(6). Pretrial defendants should be incentivized to comply with pretrial release, to
17 demonstrate their rehabilitation, and to reach out to pretrial services for help *before* relapsing—just as
18 Mr. Alnas did here. While Mr. Alnas was eager to benefit from the services of CAP, CAP is not the
19 only alternative to incarceration when the team determines CAP is not the right fit. Other "kinds of
20 sentences available" are (1) a deferred sentencing track with an individualized success plan, as
21 detailed by Mr. Alnas; or (2) sentencing to time served at this time, since Mr. Alnas has demonstrated
22 his dedication to recovery and change for over 2.5 years without the structure of CAP. These are the
23 most appropriate paths to accomplishing and balancing all of the goals of sentencing—including
24 rehabilitation, deterrence, safety of the community, avoiding unwarranted disparities, and imposing
25 the lowest appropriate sentence available.

26 **IV.   Mr. Alnas has been receiving world-class care for his congenital heart condition which cannot be matched in Bureau of Prison custody and incarceration would put his health at
27   undue risk (18 U.S.C. § 3553(a)(2)(D))**
28 Due to the severity of Mr. Alnas' heart condition, he has been referred to the renowned

specialist physicians at University of California, San Francisco, for ongoing care. *See* Ex. L (Letter from Cardiologist). His current physician, Dr. Edward P. Gerstenfeld, is Chief of the UCSF Cardiac Electrophysiology and Arrhythmia Service. *See* Ex. H. Mr. Alnas' most recent outpatient procedure was today, May 5, and was not successful, therefore requiring a follow-up appointment with Dr. Gerstenfeld this week to determine next steps. The level of care Mr. Alnas requires to keep him healthy and alive cannot be matched in the Bureau of Prison, which provides notoriously deficient medical care. *See, e.g.,* Office of the Inspector General, *Evaluation of Issues Surrounding Inmate Death in Federal Bureau of Prisons Institutions*, Department of Justice (February 2024), available at https://oig.justice.gov/sites/default/files/reports/24-041.pdf; Walter Pavlo, *Cases Show Medical Care Under Scrutiny At Federal Bureau of Prisons*, Forbes (March 13, 2025); Beckler and Einbinder, *The untimely death of Chrisopher Cox*, Business Insider (December 24, 2024) ("As with many men and women incarcerated in the United States, Cox's life was left in the hands of overstretched and minimally qualified medical providers operating in institutions that rarely face accountability for shoddy care."). This is especially true at present, because the continuing resolution has already resulted in reduced medical staffing and reduced wages in BOP. Drew Friedman, *Days ahead of coming BOP pay cuts, some employees already resigning*, Federal News Network (March 14, 2025) ("As a result of BOP's announcement, some employees have already left their positions. At a federal medical center in Lexington, Kentucky, for example, several doctors and physician assistants have put in their resignation letters."); Eric Wager, *23,000 federal prison workers are set to take pay cuts up to 25% next month*, Government Executive (February 26, 2025). In order to provide Mr. Alnas with needed medical care in the most effective matter, as required by 18 U.S.C. § 3553(a)(2)(D), Mr. Alnas should remain out of custody to continue his rehabilitation and compliance with supervision.

## CONCLUSION

For the aforementioned reasons, Mr. Alnas respectfully requests the Court either (1) defer his sentencing for six months and require him to complete an ISP under the supervision of Pretrial Services; or (2) sentence him to time served, three years of supervised release, and appropriate conditions of pretrial release.

Dated: May 5, 2025                    Respectfully submitted,

                                                JODI LINKER
                                                Federal Public Defender
                                                Northern District of California

                                                /S_____
                                                SOPHIA WHITING
                                                Assistant Federal Public Defender